# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PA EDUCATION ASSOCIATION
655 K Street NW, Suite 700
Washington, D.C. 20001-2385,

and

AMERICAN ACADEMY OF PHYSICIAN
ASSOCIATES
2318 Mill Road, Suite 1300
Alexandria, VA 22314,

        **Plaintiffs,**

v.

UNITED STATES DEPARTMENT OF
EDUCATION
400 Maryland Ave SW,
Washington, D.C. 20202,

and

LINDA MCMAHON, in her official capacity
as Secretary of Education,
United States Department of Education
400 Maryland Ave SW,
Washington, D.C. 20202,

        **Defendants.**

Case No. 26-cv-01941-BAH

**MOTION AND MEMORANDUM IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Paul D. Cullen, Jr. / Bar No. 463759
Kathleen Balthrop Havener / Bar No. 432638
The Cullen Law Firm, PLLC
1101 30th Street, Suite 500
Washington, DC 20007
202-298-4775
kathleen@cullenlaw.com
202-298-4774
paul@cullenlaw.com

*Attorneys for Plaintiffs*
*PA Education Association and*
*American Academy of Physician Associates*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 7

I.      The Standard for Injunctive Relief. .................................................................... 7

II.     Petitioners are Likely to Succeed on the Merits of the Case. ............................ 8

        A.      The Final Rule conflicts with the statute and the Department lacked the
                authority to impose a stricter definition than enacted by Congress. ....................... 8

        B.      The Department's alteration of the definition of "professional degree" to
                exclude PAs was arbitrary and capricious in violation of the law. ....................... 11

III.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm ......................... 13

        A.      Students aspiring to PA degrees will suffer irreparable harm absent an
                injunction. ......................................................................................................... 14

        B.      Educational programs leading to the PA degree will suffer irreparable
                harm absent an injunction. ................................................................................. 16

        C.      The PA profession at large will be harmed if the Final Rule is not
                enjoined. ............................................................................................................. 18

IV.     The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor. ......................... 19

CONCLUSION ....................................................................................................................... 21

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                                    **Page(s)**

*Animal Legal Def. Fund, Inc. v. Perdue*,
    872 F.3d 602 (D.C. Cir. 2017)............................................................................12

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984)............................................................................................10

*Clevinger v. Advoc. Holdings, Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025)...........................................................................8

*Doe v. FEC*,
    920 F.3d 866 (D.C. Cir. 2019)............................................................................11

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500, 425 U.S. App. D.C. 31 (D.C. Cir. 2016) ........................................8

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................................................11

*Murphy v. IRS*,
    493 F.3d 170 (D.C. Cir. 2007)............................................................................11

*Orion Reserves Ltd. P'ship v. Salazar*,
    553 F.3d 697 (D.C. Cir. 2009)............................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).......................................7, 8

**Federal Statutes**

5 U.S.C. § 706(2)(A)..............................................................................................8, 12

5 U.S.C. § 706(2)(C)....................................................................................................8

20 U.S.C. § 1087e ...............................................................................................1, 2, 9

Administrative Procedure Act...........................................................1, 8, 9, 10, 11, 12

One Big Beautiful Bill Act, Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025)..............1, 2, 9

**Regulations**

34 C.F.R. § 668.2(b) .....................................................................................................9

*Reimagining and Improving Student Education*, 91 Fed. Reg. 4254, 3266 (Jan. 30, 2026)......4, 10

*Reimagining and Improving Student Education – Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23799-23800 (May 1, 2026)...........................................1, 9

*Reimagining and Improving Student Education-Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23880 (May 1, 2026)...........................................................4

*Reimagining and Improving Student Education-Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23796 (May 1, 2026)..........................................................12

**Other Authorities**

*2024 Health Care Workforce Scan* 9 (2024), https://www.aha.org/system/files/media/file/2023/11/2024_AHA_Health_Care_Workforce_Scan.pdf ..........................................................................................................................................3

AAPA, *History of AAPA & the PA Profession*, https://www.aapa.org/about/history/ ..................15

*Become Certified*, NCCPA, https://www.nccpa.net/become-certified ..........................................13

Centers for Disease Control and Prevention, *Collaborative Practice Agreements and Pharmacists' Patient Care Services: A Resource for Pharmacists* 1 (2013), https://www.cdc.gov/high-blood-pressure/media/pdfs/2024/04/Translational_Tools_Pharmacists.pdf ..........................................12

Ctr. for Disease Control, *Chronic Diseases: About Chronic Diseases* (Apr. 14, 2026), https://www.cdc.gov/chronic-disease/about/index.html.................................................................6

Gracy Trinoskey-Rice, Amy Simmons & Joe Dunn, *Closing the Primary Care Gap: How Community Health Centers Can Address the Nation's Primary Care Crisis* 2 (2023), https://www.nachc.org/resource/closing-the-primary-care-gap-how-community-health-centers-can-address-the-nations-primary-care-crisis ..................................................................................3

Am. Hosp. Ass'n, *Graduate and Professional Programs* (May 2026), https://www.aha.org/fact-sheets/2026-02-11-fact-sheet-federal-student-loan-limits-graduate-and-professional-programs....6

HRSA Data Warehouse, *Health Workforce Shortage Areas*, https://data.hrsa.gov/topics/health-workforce/shortage-areas/dashboard ...............................................................................3, 20

TNAA and Total Med, *Healthcare Workforce Shortages: Challenges, Causes, and Solutions* (Aug. 29, 2025), https://tnaa.com/blog/the-state-of-healthcare-workforce-shortages-challenges-causes-and-solutions ...................................................................................................................2

Jasmine Castroverde & Ronamil Portes, *1 in 5 Americans to be 65 years old or older by 2030*, S&P Global (Nov. 14, 2024), https://www.spglobal.com/market-intelligence/en/news-insights/articles/2024/11/1-in-5-americans-to-be-65-years-old-or-older-by-2030-86270288 ........2

Robert P. Shpiner, *Why America is failing its health report card*, The Guardian (May 29, 2026, 9:00 AM EDT), https://www.theguardian.com/commentisfree/2026/may/29/us-healthcare-expense-report-card.................................................................................................................19

Roderick S. Hooker, Amanda J. Moloney-Johns & Mary M. McFarland, *Patient Satisfaction with Physician Assistant/Associate Care: an International Scoping Review* 1 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6935095 .....................................................19

**INTRODUCTION**

Plaintiffs, the PA Education Association ("PAEA")[1] and the American Academy of Physician Associates ("AAPA")[2] hereby move to enjoin the implementation of the U.S. Department of Education's Reimagining and Improving Student Education Final Rule issued May 1, 2026 (the "Final Rule"),[3] because it unlawfully redefines professional degree programs. Plaintiffs seek an Order from this Court enjoining the effective date of the Final Rule on July 1, 2026, compelling the U.S. Department of Education (the "Department") to treat Physician Associate/Assistant ("PA") students as "professional degree" students and allow them to use the highest loan limits available under the Final Rule, because they meet the definition of professional student set forth in the authorizing statute. [4] As written, the Final Rule expressly excludes students aspiring to PA degrees from classification as professional students. *See* Declaration of Todd Pickard ("Pickard Dec."), attached hereto as Exhibit 1, at ¶ 37.[5] Thus, the Final Rule is not in accordance with law, exceeds the Department's statutory authority, is arbitrary and capricious, and violates the Administrative Procedure Act ("APA").

---

[1] PAEA is the only national organization representing PA educational programs in the United States. Currently, all of the accredited programs in the country are members of the Association. PAEA provides services for faculty at its member programs, as well as to applicants, students, and other stakeholders.

[2] AAPA is the national professional society for PAs. It represents a profession of more than 200,000 PAs across all medical and surgical specialties in 50 states, the District of Columbia, U.S. territories, and the uniformed services.

[3] *Reimagining and Improving Student Education – Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23799-23800 (May 1, 2026) (to be codified at 34 C.F.R. pts. 674, 682, and 685).

[4] "One Big Beautiful Bill Act," Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025); 20 U.S.C. § 1087e.

[5] An index to the Exhibits to this Motion and Memorandum follows the Certificate of Service attached hereto.

Furthermore, the Final Rule is a significant departure from the statutory requirements articulated by Congress in H.R.1, commonly known as the "One Big Beautiful Bill" Act (the "Act"). Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025); 20 U.S.C. § 1087e. By excluding PAs from classification as professional students, the Department acted contrary to Congressional intent. The Department's action of excluding PAs from obtaining professional student loans from the federal government will create unnecessary and arbitrary barriers to PA education and will undermine efforts to strengthen the healthcare workforce at a time when the national need for primary care providers is acute and pervasive.

The United States faces a serious shortage of advanced healthcare workers. Healthcare is anticipated to outpace all other industries in job growth in the United States over the next decade, with an expected 1.6 million new job openings by 2033—that is, about 24% of all new jobs in the economy.[6] Juxtapose this projection with the healthcare needs of an aging nation—S&P Global estimates that one in five Americans will be 65 or older by 2030[7]—and the unavoidable conclusion is that the supply of healthcare workers and the demands of an ever more vulnerable population are on a collision course. In the coming decades, this will create a healthcare emergency impacting the health of all Americans.

Worldwide health catastrophes like the COVID-19 pandemic have only exacerbated the situation and increased the demand for PAs. Research by the National Council of State Boards of Nursing found that approximately 100,000 registered nurses left the workforce during the

---

[6] *See The State of Healthcare Workforce Shortages: Challenges, Causes, and Solutions*, TNAA and Total Med (Aug. 29, 2025), https://tnaa.com/blog/the-state-of-healthcare-workforce-shortages-challenges-causes-and-solutions.

[7] Jasmine Castroverde and Ronamil Portes, *1 in 5 Americans to be 65 years old or older by 2030*, S&P Global (Nov. 14, 2024), https://www.spglobal.com/market-intelligence/en/news-insights/articles/2024/11/1-in-5-americans-to-be-65-years-old-or-older-by-2030-8670288.

pandemic.[8] Almost 800,000 additional nurses—including nearly 190,000 who were 40 or younger— reported an intent to leave the workforce by 2027 due to stress, burnout or simply retirement.[9] Two out of three physicians reported serious consideration of a change in employment, and more than one-third of those surveyed say they were contemplating early retirement due to overwork.[10] As of May 2026, approximately 106 million Americans already live in primary care health professional shortage areas.[11] All available evidence supports the fact that the U.S. healthcare system faces a profound and immediate need for many more highly qualified healthcare workers.

Over 100 million Americans face barriers to accessing primary care, according to a 2023 study, *Closing the Primary Care Gap: How Community Health Centers Can Address the Nation's Primary Care Crisis*, by the National Association of Community Health Centers and Health Landscape at the American Academy of Family Physicians .[12] *See* Declaration of Lisa M. Gables in Support of Plaintiffs' Motion for Preliminary Injunction ("Gables Dec.") attached hereto as Exhibit 2, at ¶ 11. The number of Americans who are medically disenfranchised—

---

[8] *See 2024 Health Care Workforce Scan* 9 (2024), https://www.aha.org/system/files/media/file/2023/11/2024_AHA_Health_Care_Workforce_Scan .pdf.

[9] *Id.*

[10] *See 2024 Health Care Workforce Scan* 9 (2024), https://www.aha.org/system/files/media/file/2023/11/2024_AHA_Health_Care_Workforce_Scan .pdf.

[11] *See Health Workforce Shortage Areas,* HRSA Data Warehouse, https://data.hrsa.gov/topics/health-workforce/shortage-areas/dashboard.

[12] *See* Gracy Trinoskey-Rice, Amy Simmons & Joe Dunn, *Closing the Primary Care Gap: How Community Health Centers Can Address the Nation's Primary Care Crisis* 2 (2023), https://www.nachc.org/resource/closing-the-primary-care-gap-how-community-health-centers-can-address-the-nations-primary-care-crisis.

lacking access to primary care due to an inadequate supply in their community—has nearly doubled since 2014. *See* Pickard Dec. at ¶ 21.

Against this stark backdrop, on May 1, 2026, the U.S. Department of Education released a Final Rule announcing a limitation on the number and nature of degree programs that the Department considers "professional." The definition of professional degree included in the Final Rule, however, adds requirements not contained in the statutory definition in the Act. The Final Rule limits the degrees that are to be considered professional degrees to a finite list. This approach rejects the definition that Congress enacted that permitted a broad scope of degrees that would be considered professional and be eligible for higher loan limits set for professional students in the Act. The rule excludes several highly skilled health professions, including PAs from its final definition of "professional student."

Separately, the Department's discussion in its NPRM and Final Rule expressly excluded PA degrees from the definition of professional degree, adding yet another requirement on the definition of professional student nor authorized by the statute. *Reimagining and Improving Student Education*, 91 Fed. Reg. 4254 (proposed Jan. 30, 2026) ("NPRM"); *Reimagining and Improving Student Education-Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23880 (May 1, 2026). Absent injunctive relief, beginning July 1, PA students will be denied access to the highest amount of federal loans available—$50,000 per year and $200,000 in total unless this Court intervenes.

The new regulatory definition fails to consider that PA degrees meet the elements of the statutory definition of professional degree. *See* Declaration of David Bunnell in Support of Plaintiffs' Motion for Preliminary Injunction ("Bunnell Dec."), attached hereto as Exhibit 3, at ¶ 17. The education and training required to enter the PA profession is considerable. It is intensive,

demanding, and—most importantly expensive to provide. The new debt limitation established by the Final Rule will deter prospective students from pursuing careers as PAs. The result will be fewer essential primary care providers in our communities, leading to even further reduced access to care.

PA programs—which heretofore have trained essential health care workers whose professional efforts could partially ease the ensuing health care crisis—will be relegated to the category of "graduate degree" programs. PA students will have access to only $20,500 per year and $100,000 in aggregate educational loans—an amount that does not even cover a student's tuition, let alone the cost of attendance, in the vast majority of cases. *See* Pickard Dec. at ¶ 38; Declaration of Reamer Bushardt in Support of Plaintiffs' Motion for Preliminary Injunction ("Bushardt Dec.") attached hereto as Exhibit 4, at ¶ 18; Declaration of Laura Cunningham in Support of Plaintiffs' Motion for Preliminary Injunction ("Cunningham Dec.") attached hereto as Exhibit 5, at ¶¶ 10-11; Declaration of Julianna Sloan in Support of Plaintiffs' Motion for Preliminary Injunction ("Sloan Dec.") attached hereto as Exhibit 6, at ¶ 9; Declaration of Olivia Trull in Support of Plaintiffs' Motion for Preliminary Injunction ("Trull Dec.") attached hereto as Exhibit 7, at ¶ 11; Gables Dec. at ¶37. The Department's Final Rule is perversely counter to the goal of meeting the healthcare system's—and the nation's—critical needs. The definition fails to account for the significant education and training required to enter these professions and will certainly deter prospective students from pursuing health care careers. *See, e.g.,* Bunnell Dec. at ¶¶ 12, 18, 23; Declaration of Benjamin Pinckney ("Pinckney Dec."), attached hereto as Exhibit 8, at ¶ 23; Trull Dec. at ¶¶ 15, 18; Bushardt Dec. at ¶ 21, 25. It will inevitably result in fewer available qualified, essential clinicians and reduced access to essential care.

According to the American Hospital Association,[13] the narrowed definition of a professional degree will make these shortages worse. As the need for health care workers continues to grow, reduced loan access will likely:

- Increase out-of-pocket costs for students or force students to take on a patchwork of private loans at higher cost.

- Reduce enrollment in advanced practice registered nurse (APRN) and other advanced degree health care programs like PA programs because prospective students cannot finance tuition and living costs.

- Shrink the pipeline of qualified faculty, making it harder for schools to expand enrollment in undergraduate, graduate, and doctoral programs, and thereby exacerbating existing workforce shortages.

- Narrow the supply of clinicians who provide primary care, maternal health, behavioral health, and rural/safety-net services and long-term support services.

- Disproportionately impact rural and underserved areas by limiting access to high-need critical services.

- Result in longer wait times for patients, delayed diagnoses and increased emergency visits, ultimately raising costs and straining health systems.[14]

Health care — and hospital care in particular — requires a full team of highly trained health care professionals working together to provide superior, broad-based, patient-centered care. An interdisciplinary model is important in approaching increasingly complex healthcare needs. It is estimated that three in every four Americans has at least one chronic health condition and more than half of all Americans have more than two.[15]

---

[13] *See Fact Sheet: Federal Student Loan Limits for Graduate and Professional Programs*, Am. Hosp. Ass'n (May 2026), https://www.aha.org/fact-sheets/2026-02-11-fact-sheet-federal-student-loan-limits-graduate-and-professional-programs.

[14] *Id.*

[15] *See Chronic Diseases: About Chronic Diseases,* Ctr. for Disease Control (Apr. 14, 2026), https://www.cdc.gov/chronic-disease/about/index.html.

Average loan costs across health care workforce programs are higher than the graduate-level limitations established by the Act. If the Rule is not enjoined, beginning July 1, 2026, PA students will be limited to annual federal loans set at $20,500, a cap that falls far short of tuition alone. *See* Pickard Dec. at ¶ 38; Gables Dec. at ¶ 37; Cunningham Dec. at ¶ 10-11; Sloan Dec. at ¶ 8; Trull Dec. at ¶ 11. The rule will irreparably harm Plaintiffs, students preparing to be PAs, the institutions that offer PA programs, and the professional associations that advocate for them. It will interfere with patient access to high-quality care delivered by PAs by limiting those who can choose the PA profession to students with sufficient wealth to cover the ever-increasing cost of PA education and training or creditworthiness to apply for private loans. *See* Bunnell Dec. at ¶¶ 19-22. The Final Rule will weaken our health care system, which is contrary to the nation's best interest. It will have lasting negative consequences not just for PA students and those aspiring to become PAs, but for the strength, stability, and capacity of the nation's healthcare workforce. *See* Bushardt Dec. at ¶ 45. This is particularly detrimental at a time when there is a significant shortage of primary healthcare providers nationwide, and especially in rural and other traditionally underserved communities.

## ARGUMENT

### I.      The Standard for Injunctive Relief.

Plaintiffs satisfy each of the elements for issuance of a preliminary injunction. Under the applicable standard, "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The last two factors merge where the government is a party because "the

government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511, 425 U.S. App. D.C. 31 (D.C. Cir. 2016) (emphasis in the original).

Although the Court of Appeals has explained that the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.* "can be read to require movants to establish *each* preliminary injunction factor independently," the Court of Appeals has not explicitly rejected the sliding-scale approach under which a plaintiff's "failure to establish one of the four factors does not always doom its motion for a preliminary injunction." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-36 (D.C. Cir. 2025).

Plaintiffs' Complaint and the evidence accompanying the instant motion demonstrate that Plaintiffs will be irreparably harmed without an injunction from this Court. Moreover, Plaintiffs have shown that, because of the Final Rule's unauthorized departure from the statute, they are likely to succeed on the merits of their claims, and that the equities and public interest weigh in favor of enjoining Defendants' rule from taking effect. The Court should therefore grant Plaintiffs' request and enjoin (1) Defendants' implementation of the definition of professional degree in the regulatory language of the Final Rule and (2) vacate the Defendants' separate finding and conclusion in the NPRM and Final Rule the PA degrees do not meet the definition of professional degree.

## II.   Petitioners are Likely to Succeed on the Merits of the Case.

### A. The Final Rule conflicts with the statute and the Department lacked the authority to impose a stricter definition than enacted by Congress.

The Administrative Procedure Act (APA) commands a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). These are independent and conjunctive

grounds for invalidation. Plaintiffs allege that the language of the Final Rule and the Department's separate findings as to PAs violate the APA because they are not in accordance with law and exceed the Department's statutory jurisdiction and authority.

The Final Rule's first violation is a definition of "professional degree" that imposes requirements that are stricter than the definition enacted by Congress, specifically: (1) that the degree be "generally at the doctoral level, (2) that the degree requires at least six academic years of postsecondary education coursework for completion, and (3) that the program have "a four-digit program CIP code…in the same intermediate group as the field listed in paragraph (ii)(a) of this definition." *See Reimagining and Improving Student Education – Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23882 (May 1, 2026) (to be codified at 34 C.F.R. pts. 674, 682, and 685). Congress did not include these requirements in its statutory definition of "professional degree."

Congress specifically provided that "the term 'professional student' means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program." Pub. L. No. 119-21, § 81001, 139 Stat. 72, 335 (2025); 20 U.S.C. § 1087e. That regulation has been in place for two decades and defines "professional degree" as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.). Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

*See* 34 C.F.R. § 668.2(b). Notably, not all the degrees included in the list are doctoral degrees.

9

Because the PA profession requires a master's degree instead of a doctoral degree for entry into practice, and PA degrees are not named in the new regulatory definition's exclusive list of professional degrees, the PA degree does not meet the new regulatory requirements for a professional degree as defined in the Final Rule. Consequently, under the Final Rule, PA students cannot qualify for the higher-level loan amounts available to professional students. These factors violate the applicable statute.

The Final Rule's second APA violation is in the discussion sections of the NPRM (and confirmed in the Final Rule). *i.e.*, specific findings and conclusions that PA master's degrees do not satisfy the requirements under the new regulatory definition of professional degree because most states require a PA to collaborate with (or be directly supervised by) a physician or other health care provider in order to practice and prescribe medication. *See* 91 Fed. Reg. 4254, 4266 (Jan. 30, 2026). This "free-from-supervision" qualification is not in the statutory definition of "professional degree," nor in the regulatory language in the Final Rule. This requirement conflicts with the statutory definition of "professional degree" and therefore violates the APA. Moreover, in a large number of jurisdictions, the referenced supervision is not required for licensure.

The threshold question in any challenge to agency action is "always... whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Where Congress has directly spoken—as it has here by enacting a specific categorical definition— "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. And, as the Supreme Court has told us, "Courts must exercise their independent judgment in

10

deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

An agency cannot grant itself power via regulation that conflicts with plain statutory text. *Doe v. FEC,* 920 F.3d 866, 874 (D.C. Cir. 2019) (LeCraft Henderson, J., concurring); *citing Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("[R]egulation contrary to a statute is void."); *Murphy v. IRS*, 493 F.3d 170, 176 (D.C. Cir. 2007) (if "the regulation conflicts with the plain text . . . the statute clearly controls").

Here, the Department drafted a rule and made separate findings and conclusions related to PAs that conflict with the statute. The statute would include PA students among those eligible for the higher loan limits. On the question of who qualifies to be a professional degree student, the Department has exceeded its authority and drafted a regulation that violates the law. Hence, Plaintiffs have established their likelihood of success on the merits.

**B. The Department's alteration of the definition of "professional degree" to exclude PAs was arbitrary and capricious in violation of the law.**

The Final Rule is also arbitrary and capricious in violation of the APA. The Department arbitrarily relied on several factors Congress did not intend that it consider—*e.g.*, whether professionals are subject to supervision and the "historical context" of the Department's regulation. Moreover, the Department's application of those factors is internally inconsistent and contradictory.

The Final Rule's regulatory text is internally inconsistent because it adds requirements to be a professional degree that cannot be met by all of degrees on the list deemed as professional in the same regulation. For example, the listed Theology (M.Div., or M.H.L.) degrees and the L.L.B. law degree are not doctoral degrees, meaning they do not satisfy the new regulatory requirement that professional degrees be at the doctoral level. Indeed, the Department

11

acknowledges that the statutory definition of professional degree includes three degrees that are below the doctoral level. *See Reimagining and Improving Student Education-Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768, 23796 (May 1, 2026).

Additionally, the Department's finding that PAs do not hold a professional degree because half of the states require PAs practice and prescribe medicine under the supervision of another professional conflicts with the Final Rule's list of specific professional degrees. For example, some states recognize special classifications that allow graduates with a M.D. degree who have not matched with a residency to practice under supervision.[16] In addition, pharmacists, who hold a Pharm.D. degree, enter collaboration agreements with prescribers to expand their practice to include medication management.[17] These M.D. and Pharm.D. degrees would not qualify as professional degrees under the standard the Department applied to PA degrees.

The APA requires a court to invalidate agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The words "arbitrary and capricious" signify a robust, decades-old doctrine by which courts invalidate unjustified agency decisions. Arbitrary and capricious" review is a critical component of any judicial review of agency action. It is invoked whenever an agency plainly lacks the statutory authority to take the action that it did. *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017).

---

[16] *See* Attachment A (pages 7-8) to the Declaration of Todd Pickard ("Pickard Dec."), attached hereto as Exhibit 1.

[17] A "Collaborative Practice Agreement (CPA)" is "[a] formal agreement in which a licensed provider makes a diagnosis, supervises patient care, and refers patients to a pharmacist under a protocol that allows the pharmacist to perform specific patient care functions." Centers for Disease Control and Prevention, *Collaborative Practice Agreements and Pharmacists' Patient Care Services: A Resource for Pharmacists* (2013) at 1, https://www.cdc.gov/high-blood-pressure/media/pdfs/2024/04/Translational_Tools_Pharmacists.pdf.

### III.    <u>**Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm**</u>.

Perhaps more than any other factor, the most compelling in favor of granting a motion for preliminary injunction is that Plaintiffs—prospective PA students, healthcare institutions that employ PAs, educational institutions that prepare them for their careers as PAs, and the associations who represent both the individuals and the institutions—will immediately and permanently suffer irreparable harm in the absence of the Court's intervention. Aspiring students, practicing PAs, institutions that educate PAs, and the associations that represent them all face irreparable harm in a variety of ways.

The educational and clinical program that prepares an individual for a career as a professional PA is unique, intense, and demanding. *See* Pickard Dec. at ¶ 38; Cunningham Dec. at ¶¶ 15-16. It involves didactic class work and clinical rotations which cannot be interrupted. PA students are commonly not allowed to hold outside (or any) employment while they are enrolled in their professional degree program. *See* Cunningham Dec. at ¶¶ 15-16; Pickard Dec. at ¶ 38. The entire program lasts between 24 and 28 months. *See* Cunningham Dec. at ¶ 14; Trull Dec. at ¶ 9. After graduating from an accredited PA program, aspiring PAs are required to pass the Physician Assistant National Certifying Examination ("PANCE") offered through the National Commission on Certification of Physician Assistants ("NCCPA"). Certification is a professional requirement for licensure in all U.S. jurisdictions.[18]

More important for this Court, a PA degree and a PA degree educational programs are costly—in far more than economic terms—due to the effort of administering and obtaining education.[19] When outgoing AAPA President Todd Pickard graduated from PA school in 1997—

---

[18] *See Become Certified*, NCCPA, https://www.nccpa.net/become-certified.

[19] Plaintiffs do not reference tuition costs as economic harm. Rather, tuition costs in combination with the lower loan limitations demonstrate that the Final Rule places an overwhelming obstacle

nearly 30 years ago—he owed $87,000 in student loans, an amount that exceeds the $20,500 per year to be permitted under the Department's Final Rule. *See* Pickard Dec. at ¶¶ 38, 42. That amount represents tuition alone, and with inflation and increases to the cost of living and higher education generally since that time, it is unrealistic to expect program costs to decrease below the level they were decades ago. The total cost of attendance is beyond the reach of any student who is not independently wealthy or whose wealthy parents are willing to fully support their education. That only the wealthiest or most creditworthy student will be able to attend PA school under the Final Rule is contrary to common sense, contrary to the public interest, and contrary to law.

### A. Students aspiring to PA degrees will suffer irreparable harm absent an injunction.

Prospective PA students who are applying, or have been accepted to attend a PA degree program as soon as this summer and this fall, and were relying on the availability of the federal loans to help finance their education are the first parties who will be harmed should the court not enjoin the July 1 effective date of the Final Rule.

There is no doubt that tuition for PA programs vastly exceeds the reduced loan limitations articulated in the Final Rule. Median tuition alone at state universities exceeds $68,323 for in-state students and $108,507 for non-residents, and total cost of attendance often surpasses $200,000. *See* Pickard Dec. at ¶38. Tuition alone at the only PA school in Washington State is $137,000 for a 28-month program. *See* Trull Dec. at ¶ 8. One declarant, whose living

---

in the path of many aspiring PAs. The Final Rule undermines the professional aspirations of countless aspiring PAs who have planned—sometimes for decades—to serve their communities as front line health care providers. If the Final Rule stands, they will never be allowed to do so, not because they have suffered economic harm, but because the government has arbitrarily decided that it does not want to provide loans to them as it does to students in other programs.

expenses were covered by her spouse, owed $97,000 at the conclusion of her PA degree—over *ten years ago* in 2015. *See* Cunningham Dec. at ¶¶ 12-13. PA programs should therefore be understood as essentially costly – not as programs that have arbitrarily inflated tuition costs over the years.

Due to the intensive nature of PA education, the typical PA program strongly discourages or prohibits students from outside employment. *See* Cunningham Dec. at ¶ 15; Gables Dec. at ¶ 37; Pickard Dec. at ¶ 38; Trull Dec. at ¶ 10. Thus, PA students may not make up the shortfall created by the new loan limitations by working their way through school or attending part time. Conversely, PA schools cannot lower tuition because the curriculum is rigorous and the schools must engage appropriately qualified faculty to provide it. *See* Trull Dec. at ¶¶ 10, 17.

Aspiring PA students faced with the lower loan limitations are exploring alternatives that take the new limits into account. Those who have explored private loans are finding that they cannot qualify because their credit histories are not established enough for them to qualify. *See* Sloan Dec. at ¶ 3. Even if they can somehow qualify, with co-signatories or on their own, those loans would come with interest at annual percentage rates of 14 to 15%, putting them out-of-reach for aspiring PA students. *See* Trull Dec. at ¶ 10; Declaration of Jasmine Vasquez in Support of Plaintiffs' Motion for Preliminary Injunction ("Vasquez Dec."), attached hereto as Exhibit 9, at ¶ 18. After all, one of the purposes of the creation of the PA role was to allow for an abbreviated, less-expensive alternative to medical school for students who already had some clinical experience.[20] *See* Trull Dec. at ¶¶ 4-6, Pickard Dec. at ¶ 23. The new loan limitations

---

[20] The original class of PA students, all of whom had been medical technicians in the U.S. Navy and received considerable medical training during their military service. The curriculum of the

threaten to stop the 60-year-old profession in its tracks. *See* Trull Dec. at ¶ 20-22. If future PA

students and PAs are not classified as "professional students" for federal loan purposes, it will

undermine the confidence, morale, and professional identity of existing PAs, PA students, and

future PA students. *See* Bushardt Dec. at ¶¶ 31-32.

One particularly cruel defect in the Final Rule is that—while current PA students are

"grandfathered" and may continue to borrow federal loans covering the full cost of attendance—

students who must defer their matriculation or absolutely must take time off due to an

unexpected pregnancy or other entirely understandable reason are not "grandfathered" in. They

cannot borrow at the pre-July 1 loan limit even if they were able to take advantage of the higher

loan amounts when they began their PA program. *See* Vasquez at ¶¶ 15-16. Another cruel twist

is that CASPA—the Centralized Application Service for Physician Assistants—opened for new

students on April 30, 2026, the day the Final Rule was first announced. Many aspiring PAs are

confronted with filling out their applications on CASPA without any understanding of

whether—even if they are admitted—they will have the financial wherewithal to matriculate

when their PA program begins. *See* Pinckney Dec. at ¶¶ 21-23.

### B. Educational programs leading to the PA degree will suffer irreparable harm absent an injunction.

Universities and colleges that educate PA students will be immediately and irreparably

harmed by the Final Rule, including those students and programs that are about to begin a PA

course of study this summer and fall, unless the Court grants injunctive relief enjoining its

implementation. PA schools are training future medical professionals who, in practice, work in

every setting from private practice, *see* Cunningham Dec. at ¶¶ 23-24, to community health

---

first PA program was based on the fast-track training of doctors during World War II. See
AAPA, "History of AAPA & the PA Profession," https://www.aapa.org/about/history/.

centers in rural and underserved areas, *see* Gables Dec. at ¶¶ 13-17, to the Department of Veterans Affairs health care system, *id.* at ¶ 12, to the most advanced specialty care centers in America. *See* Pickard Dec. at ¶¶ 13-14, 41, 45, 51-55; Bushardt Dec. at ¶ 36.

The lowered loan limitations are causing prospective PA students who have been accepted but not yet enrolled to reconsider (1) whether they should enroll at all, (2) whether they should defer their PA education, (3) or if they should attend a program other than the one they have chosen. This causes an immediate uncertainty at educational institutions about the number of PA students who will ultimately enroll. This uncertainty alone disrupts admissions planning and student counseling. *See* Bushardt Dec. at ¶ 21. It creates an atmosphere of instability within a program.

If PA program applicants decide not to apply, not to enroll, or to pursue a different program, PA educational programs cannot recreate the same applicant pool after the fact. *Id.* at ¶ 22. PA programs depend on a stable cohort and most PA programs do not accept transfer students. If students withdraw, defer, or decline admission, the educational experience of the entire cohort will be affected, and the PA programs will not be able to replace students who withdraw after their cohort begins. *Id.* at ¶ 23. PA educational programs emphasize team-based and interprofessional learning. A smaller or unstable cohort will interfere with group learning, peer support, simulation exercises, and team-based clinical preparation. *See id.* at ¶ 24.

Students from lower-income backgrounds, first-generation college graduates, and students from underrepresented communities will be more likely to abandon PA education if the federal misclassification is allowed to stand. *See* Bushardt Dec. at ¶ 25. The misclassification of PA students as "graduate students" instead of "professional students" will harm the mission of

PA programs to prepare a diverse health care workforce to serve an ever more increasingly diverse population. *Id.*, *see also id.* at ¶¶ 40-41.

PA programs must prepare PA students by means of clinical rotations. This requires significant advance planning with hospitals, clinics, preceptors, schedules, as well as other professionals who accomplish onboarding and supervision. If PA school enrollment is uncertain, PA programs will have difficulty matching students and placing them into planned clinical placements. If PA programs are unable to reliably fill clinical rotation slots or must make last-minute changes, their clinical partners will lose confidence and offer those placements to other programs. *Id.* at 26-27. PA programs necessarily rely on PA preceptors and other clinicians who invest time in teaching students who are placed under their supervision and direction. Uncertainty about a program's future applicant pool or cohort size will reduce preceptor willingness to continue partnering with PA programs to continue educating and training their students. *Id.* at ¶ 28.

PA faculty join PA educational programs to train future licensed clinicians. *Id.* at ¶ 29. A federal misclassification that downgrades the professional status of PA education will harm faculty morale and make recruitment or retention of faculty more difficult. *Id.* Program leaders, admissions staff, and financial-aid staff will have their attention diverted away from educating students, clinical training, and program excellence to spend time correcting misconceptions about the federal misclassification of PA students. *Id.* at ¶ 30.

### C.  The PA profession at large will be harmed if the Final Rule is not enjoined.

Perhaps most devastating to the PA profession, the Department's misclassification will undermine the public's understanding of PAs and choosing PAs to obtain treatment. The public will have unjustified doubts about whether PAs are true health professionals, even though licensure, certification, and clinical practice ensure that they absolutely are. *See* Bushardt Dec.

at ¶ 31; Bunnell Dec. at ¶ 27. PAs are skilled clinicians engaged in team-based patient care. *See* Pickard Dec. at ¶¶ 17, 52-54. Reduced confidence in the program's professional status will directly interfere with PA's status within those teams and may undermine public confidence in PAs and the level of care they offer. *See* Bushardt Dec. at ¶ 31. Active PAs will suffer harm to their professional reputations at a time when PAs are becoming acceptable and commonplace as primary care physicians and in all specialties. *See* Bunnell Dec. at ¶¶ 27-28.

**IV.     The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor.**

Over 100 million Americans have no access to accessing primary care, and do not receive care until they are sick enough to visit to an emergency department.[21] The estimated number of Americans who are medically disenfranchised—lacking access to primary care due to an inadequate supply in their local community—has nearly doubled since 2014. *See* Pickard Dec. at ¶ 21.

The PA profession has worked hard to design and implement a program design that will produce socially and ethically responsible graduates who are committed to serving diverse communities that are underserved and lack physically and economically accessible healthcare services. *See* Trull Dec. at ¶ 20; Cunningham Dec. at ¶¶ 34-39. The original purpose of creating of the PA profession—providing accessible and affordable health care to as many U.S. residents as possible—will be defeated and its realization reversed after sixty years of incremental success if the Department's definition of professional degree is not enjoined.

---

[21] *See* Robert P. Shpiner, *Why America is failing its health report card*, The Guardian (May 29, 2026 at 09:00 EDT), https://www.theguardian.com/commentisfree/2026/may/29/us-healthcare-expense-report-card.

PAs provide high-quality sophisticated healthcare, and patients consistently indicate high levels of satisfaction with PAs, comparable with care delivered by physicians.[22] Indeed, PAs are sometimes involved in training and overseeing the medical rotations of M.D. and D.O. students. *See* Cunningham Dec. at ¶¶ 32-33. PAs are dedicated to expanding access to care and transforming health and wellness through patient-centered, team-based medical practice. The federal government has formally recognized the severity of provider shortages in certain rural and underserved communities. The Health Resources and Services Administration (HRSA) has designated 8,992 Primary Care Health Professional Shortage Areas (HPSAs) nationwide, as of June 2, 2026, as well as 6,604 Mental Health HPSAs, reflecting widespread and persistent shortages of qualified clinicians.[23]

A large number of current and aspiring PAs indicate an intention to practice in federally designated shortage areas. Specifically, one-third (33%) of surveyed PA students and prospective students reported having worked or planning to work in a rural community, and nearly half (43%) reported the same intention for medically underserved areas (MUAs) or HPSAs. *See* Gables Dec. at ¶ 15. Those aspirations cannot be realized if, as a society, we put impediments in the way of aspiring PAs.

On the other hand, the government faces little or no downside should the Final Rule be enjoined. The government may even gain revenue if the Final Rule is enjoined. Students of any field of study defaulting on their loans is one of the primary costs of the federal loan program to

---

[22] NCCPA studies have found that more than 90 percent of patients surveyed on the matter were satisfied or very satisfied with the care they received from a PA. *See also* Roderick S. Hooker, Amanda J. Moloney-Johns, & Mary M. McFarland, *Patient Satisfaction with Physician Assistant/Associate Care: an International Scoping Review* 1 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6935095.

[23] *See Health Workforce Shortage Areas,* HRSA Data Warehouse, https://data.hrsa.gov/topics/health-workforce/shortage-areas/dashboard.

the government. Providing loans to PA students, however, is a safe bet for the Department, because PA students repay their loans. Indeed, the data shows that the default rate for student loans to PA candidates is exceptionally low, near zero. *See* Declaration of Sara Fletcher ("Fletcher Dec."), attached hereto as Exhibit 10, at ¶ 11 (default rates for PA graduates is often zero as reported by individual institutions). This fact renders the reasoning of the Department all the more puzzling. While it is true that student loans may be offered and taken out at lower than commercial interest rates, those interest rates are not zero.[24] In the long run, the government will not be harmed, and indeed, may benefit as the loans are repaid and new PAs take their place in our society contributing to the health of the community and becoming reliable taxpayers. *See* Fletcher Dec. at ¶¶ 12-13.

## CONCLUSION

For all the reasons set forth herein, and in particular because an injunction is in the public interest and will not harm Defendants, Plaintiffs respectfully ask the Court for an order enjoining the scheduled effective date of the Final Rule on July 1, 2026, and for an order commanding the Department to treat PA students as "professional students" for the purpose of access to the higher student loan limits through the Department of Education, because that they meet the definition of "professional degree" students provided by Congress in the Act.

Respectfully submitted,

Date: June 3, 2026

/s/ *Paul D. Cullen, Jr.*
Paul D. Cullen, Jr. / Bar No. 463759
Kathleen Balthrop Havener / Bar No. 432638
The Cullen Law Firm, PLLC
1101 30th Street

---

[24] Federal loans are not always offered at lower than commercial rates, but they may be preferable to students for other reasons.

Suite 500
Washington, DC 20007
202-298-4775
kathleen@cullenlaw.com
202-298-4774
paul@cullenlaw.com

*Attorneys for Plaintiffs*

*PA Education Association and American Academy
of Physician Associates*

22

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 3, 2026, a true and correct copy of the above document was provided to all counsel of record through the Court's ECF system.

/s/ *Paul D. Cullen , Jr.*_____
Paul D. Cullen, Jr.

23

## EXHIBIT LIST

Exhibit 1:    Declaration of Todd Pickard with attached comments of AAPA submitted to the Department of Education

Exhibit 2:    Declaration of Lisa Gables

Exhibit 3:    Declaration of David J. Bunnell

Exhibit 4:    Declaration of Reamer Bushardt

Exhibit 5:    Declaration of Laura L. Cunningham

Exhibit 6:    Declaration of Julianna Sloan

Exhibit 7:    Declaration of Olivia Trull

Exhibit 8:    Declaration of Benjamin Pinckney

Exhibit 9:    Declaration of Jasmine Vasquez

Exhibit 10:    Declaration of Sara Fletcher